# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-171 (JMC)** |
| **v.** | : | |
| | : | |
| **STACY LEE BOND,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Defendant Stacy Lee Bond to 45 days of incarceration, a 36-month term of probation, 60 hours of community service, and $500 in restitution.

## I.    Introduction

Defendant Stacy Lee Bond, and his co-defendant, Paula Ann Conlon, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Defendant Bond pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a period of incarceration is appropriate in this case because (1) weeks before

---

[1] Although the Statement of Offense in this matter, filed on September 23, 2022, (ECF No. 36 ¶ 6) reflects a sum of more than $2.7 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

January 6, 2021, the defendant sent messages regarding engaging in political violence ("I'm at the end of my peace leash we need to take care of business" and "I have this 4ft oak dowel 3/4 I taped a little flag to it an excellent weapon for these kind of engagements"); (2) the defendant observed chaos and violence on restricted Capitol grounds before entering the Capitol building, including watching other rioters climb scaffolding and even being pushed away himself by an officer who had been attempting to move back a crowd; (3) he entered the Capitol building through a shattered window by the Senate Wing Door, walked to a sensitive area of the building (S-140), and took photos throughout the building and Capitol grounds; (4) after he left the Capitol building, he remained on Capitol grounds for over an hour observing clashes between rioters and officers; (5) in the weeks immediately following January 6,  his social media statements demonstrated a lack of remorse and a continued endorsement of future political violence; and (6) his criminal history, while consisting of misdemeanors and somewhat aged, includes assault.

The Court must also consider that Bond's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on its large numbers to both overwhelm police officers who were trying to prevent a breach of the Capitol building and disrupt the proceedings therein. Here, the facts and circumstances of Bond's crime support a sentence of 45 days of incarceration, a 36-month term of probation, 60 hours of community service, and $500 in restitution in this case.

## II.   Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 36 (Statement of Offense), ¶¶ 1–7.

*Defendant Bond's Social Media Statements Leading Up to January 6, 2021*

Prior to the January 6, 2021 attack on the Capitol, Bond's statements in public posts and private messages on Facebook demonstrate his openness to force and violence as a means for change.  In a message sent to another individual on December 8, 2020, Bond expressed his hope for "semi martial law, eliminate the neo-marxist, prosecute all these bureaucrat criminals[.]"  Bond further stated, "Yeah we need to take this s*** back one way or another[,]" and "I'm at the point where I'm at the end of my peace leash we need to take care of business."

On December 12, 2020, Bond and co-defendant Conlon attended a rally in the District of Columbia protesting the "stolen" 2020 election.  In messages sent to another individual on December 13, 2020, Bond explained, "There's about two hundred thousand people there, was doing a lot of people watching . . . , and you could just see the difference between family minded work minded patriotic Americans compared to the rest of the scum that's out there right now[.]"  Bond also stated that "Yeah they're going to get theirs, we took a couple of flags, and I have this 4ft oak dowel 3/4 I taped a little flag to it an excellent weapon for these kind of engagements you might meet up with[,]" and "I have a buddy who's a DC cop and the DC fireman, they both say the same thing about those little antifa f*****[.]"

In private messages sent on December 21, 2020, Bond told another individual that he was going to the District of Columbia on January 5, 2021, and January 6, 2021, and invited the individual to come as well.  That person later replied "Ok cool. Im gonna coordinate with my buddy, . . . and they head of the Proud Boys.  We'll be rolling with them if I go."  Bond responds to this information with a thumbs-up and says, "That's what I plan on doing."  On December 29, 2020, Bond wrote in another private message that he and "some friends down there we're going to roll with the proud boys."

3

*Defendant Bond's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Bond traveled from Gaithersburg, Maryland, to the District of Columbia with co-defendant Conlon.  They stayed at a hotel in the District of Columbia for two nights and left on January 7, 2021.  Bond admits that the purpose of his trip to the District of Columbia with Conlon was to protest Congress' certification of the Electoral College and what he believed was a fraudulent presidential election.  ECF 39 ¶ 8.

Bond—wearing a distinctive gray hoodie—and Conlon—wearing a distinctive red coat and carrying a flagpole—joined the crowd that attended the "Stop the Steal" rally and the mob that traversed the restricted Capitol grounds toward the Capitol building.  Pictures taken by Bond show that he and Conlon approached the Capitol from the west, walking up to the Northwest Scaffolding constructed on the Senate-side of the West Front for the upcoming Presidential Inauguration, with Bond's photographs revealing other members of the mob climbing the scaffolding in front of him and Conlon.  *See, e.g.*, Images 1 through 4.



Image 1



Image 2


Image 3


Image 4

After ascending toward the Northwest Courtyard, Bond took additional pictures, including some depicting police in riot gear.  *See* Image 5.



Image 5

At approximately 2:50 p.m., MPD body-worn camera footage dated January 6, 2021, shows Bond and Conlon at the Capitol's Northwest Courtyard—adjacent to the Senate Wing Door area.  *See* Gov't's Exhibit 1 (provided separately).  Conlon carried a sign displaying the phrase "STOP THE STEAL" and "#StopTheSteal," and Bond carried a flag.  As a line of MPD officers attempted to move the crowd back, an officer wearing a body-worn camera pushed away another rioter, and Conlon, who was nearby, yelled "back off."  The officer then physically pushed Bond and Conlon away, as the pair attempted to remain in place while officers continued to advance.

Pictures taken by Bond also depict his and Conlon's progression toward windows flanking the Senate Wing Door that were previously broken by other rioters.  *See* Image 6 and Image 7.



Image 6



Image 7

Just before approximately 3:10 p.m., Bond and Conlon approached the Senate Wing Door

near the northwest quadrant of the Capitol grounds.  At approximately 3:10 p.m., Capitol CCTV

shows that Bond and Conlon entered the Capitol as part of the mob through a broken window next to the Senate Wing Door. *See* Image 8 and Image 9.[2]



Image 8



Image 9

Bond paused in the broken window to observe the crowd and hold up his phone, presumably to take pictures or record video. *See* Image 10 and Image 11.

---

[2] In these and some additional Images, Bond and Conlon are marked with red arrows.



Image 10



Image 11

Bond's photograph from the broken windows depicts multiple riot-gear-equipped officers facing the larger mob.  *See* Image 12.



Image 12

As other members of the mob attempted to enter through the broken window, Bond stepped

down from the window and waited for Conlon to enter.  *See* Images 13 through 15.



Image 13



Image 14


Image 15

Once they were through the window, Bond pulled out his phone and took a picture of the hallway. *See* Images 16 through 18 (Image 18 is Bond's picture).



Image 16



Image 17



Image 18

As they progressed, Bond and Conlon passed by multiple law enforcement officers, including riot-gear-clad U.S. Capitol Police officers. *See* Image 19.[3]



Image 19

---

[3] Officers are marked with a green arrow.

Bond and Conlon then made their way to office S-140—a sensitive area known as the Senate Spouse's Lounge—of which Bond took a picture from the hallway. *See* Image 20.



Image 20

Bond and Conlon then turned around and headed towards the Senate Wing Doors, where they exited through another broken window at approximately 3:13 p.m.  *See* Image 21 and Image 22.



Image 21



Image 22

At this point, Bond took several more pictures of his and Conlon's progression, including pictures depicting other broken Capitol windows, rioter graffiti, and officers in riot gear armed with riot shields squaring-off against the mob.  *See* Images 23 through 28.



Image 23



Image 24



Image 25



Image 26



Image 27



Image 28

Third-party videos captured Bond and Conlon standing in various areas outside the Senate Wing Door area.  *See* Gov't's Exhibits 2 and 3 (provided separately).  One third-party video captured Bond and Conlon from an exterior perspective as they exited through the other broken Senate Wing Door window.  *See* Gov't's Exhibit 4 (provided separately).

At approximately 4:22 p.m., over an hour after Bond and Conlon exited the Capitol building, MPD officer body-worn camera footage captured Bond and Conlon as they remained with a crowd near the Northwest Courtyard observing ongoing clashes between rioters and law enforcement officers.  *See* Gov't's Exhibit 5 (provided separately).  Bond stood close by as the officer carrying the body-worn camera recovered from being tackled by a rioter and pulled out a can of pepper spray.  Conlon is also shown nearby with her phone raised—either filming or photographing the fighting.

Over the course of January 6, 2021, Bond posted on and sent several messages to other individuals through social media regarding the day's events.   His messages included the photographs he took of other rioters pouring into the Capitol building through the Senate Wing and nearby Parliamentarian doors, and of police in riot gear.   *See, e.g.*, Image 23 and Image 29. In one message sent on January 6, 2021, at 5:02 p.m., Bond stated, "Yeah we pulled the old 300 on them push them back ,,down with pepper spray, my eyes are burned out of my head haha[.]"

*Defendant Bond's Social Media Statements Following January 6*

Following January 6, 2021, Bond proudly discussed his presence at the Capitol on social media and continued to discuss or respond to posts regarding the use of force to overthrow the government.   On January 7, 2021, the defendant shared an image on Facebook encouraging overthrowing the government. *See* Image 29.



Image 29

23

On January 8, 2021, Bond sent a Facebook message to another individual that said, "I went to the protest and I went down to the Capitol building see what's going on took some pictures[.]" That same day, another individual asked Bond, "Send me some pics plz[.]"  Bond sent several of his many pictures taken on January 6, 2021, including Image 3 and Image 4, *supra*, to this individual.  In similar private messages sent on January 8, 2021, Bond told another individual that "I will call you tomorrow and tell you exactly what I saw don't want to do it over Facebook."  The other individual replied, "I'm not certain what you mean but right now you are on Facebook.  If you want to report anything you saw in the suburbs or where you were, better report it to the FBI I think.  If you decide not to report anything, careful what you say on any electronic device."  Bond responded:

> I saw a peaceful protest I got there after the bad apples left, I saw a whole lot of upset people about that girl being shot, I was told by credible sources I know that the antifas or escorted out by Trump supporters, I actually wanted to share my political views and what I think is behind a lot of this I don't want to put that on Facebook, I want us to be on the same page as far as the way I feel politically.

On January 24, 2021, Bond stated in a Facebook comment reply that "all I got to say is I can't wait to see that red dot on biden's head if anybody's got it coming it's him[.]"

*Bond's Interview*

On May 17, 2022, Bond was approached at his residence by FBI agents, who informed him that there was an outstanding warrant for his arrest.  Bond voluntarily gave agents his cell phone and indicated he would cooperate.  Bond then voluntarily met the agents at a separate public location for an interview regarding his activities at the Capitol on January 6, 2021.  Bond admitted to traveling to the District of Columbia on January 6, 2021, with Conlon and to entering the Capitol building.  Bond admitted that he went to the Capitol because of "the state of the country and election fraud."  Bond admitted to being in the Capitol building for about three

minutes.  He affirmatively identified himself and Conlon in videos and photographs presented by the interviewing agents.  Bond also voluntarily provided agents with the sweatshirt he was wearing on January 6, 2021, at the conclusion of the interview.

*The Charges and Plea Agreement*

On May 3, 2022, the United States charged Bond by criminal complaint with violating (1) 18 U.S.C. § 1752(a)(1)—Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; (2) 18 U.S.C. § 1752(a)(2)—Disorderly and Disruptive Conduct in any Restricted Building or Grounds; (3) 40 U.S.C. § 5104(e)(2)(D)—Disorderly Conduct on Capitol Grounds; and (4) 40 U.S.C. § 5104(e)(2)(G)—Parading, Demonstrating, or Picketing in a Capitol Building.  On May 18, 2022, the United States charged Bond by a four-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G).  On May 26, 2022, law enforcement officers arrested him as part of a self-surrender at the FBI Baltimore Field Office.  On September 23, 2022, pursuant to a plea agreement, Bond pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, Bond agreed to pay $500 in restitution to the Architect of the Capitol.

## III.   Statutory Penalties

Bond now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.  The defendant must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days of incarceration, a 36-month term of probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Bond's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) how the defendant reacted to violence; (3) how the defendant reacted to property destruction; (4) whether, during or after the riot, the defendant destroyed evidence; (5) the length of the defendant's time inside of the building and exactly where the defendant travelled; (6) the defendant's statements on social media; (7) whether the defendant cooperated with or resisted commands from police officers; and (8) whether the defendant demonstrated remorse or

contrition.   For a misdemeanor defendant like Bond, the absence of violent or destructive acts is not a mitigating factor.   Had Bond engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Bond's case is his entrance into the Capitol building and continued presence on restricted Capitol grounds despite witnessing numerous physical altercations between rioters and law enforcement at the Capitol (including being pushed away by an officer himself on his way to entering the Capitol building), compounded by his social media endorsements of political violence.   Bond discussed with others and made public posts before and after January 6, 2021, that called for or supported, among other things, forcible government overthrow and the assassination of the President of the United States.   While Bond did not engage in violent conduct himself, the sentiments shown in his social media activity confirm that he remained at the Capitol to encourage and endorse the behavior of the other rioters who did engage in violence on January 6.

Likewise, Bond's lack of reaction to the property destruction and chaos caused on January 6, 2021, is a further important factor in this case.   Bond's nonchalant attitude while climbing through a broken Capitol window *twice* and taking pictures on his phone of memorable pieces of graffiti and vandalism demonstrate that he failed to grasp the gravity of his conduct.   As with the assaults he observed, Bond's endorsement of property destruction and the swarm of the mob are colored by the violent sentiments he shared on social media.   Furthermore, Bond went to a sensitive area in the Capitol (S-140).   Although it is unclear if he entered S-140, photos confirm that he took a photograph of the private room before exiting the Capitol building and joining the mob directly outside on the Capitol building for over an hour.

To be sure, Bond's cooperation with law enforcement in May 2022 and his ready decision to plead guilty are mitigating conduct that deserve due consideration. But these actions do not readily demonstrate genuine remorse or a complete understanding of the gravity of his conduct. Indeed, Bond's post-January 6 social media statements suggest his has pride in his acts and those of other rioters on January 6, 2021. And while Bond remained in the Capitol for a small amount of time, he stayed with the mob near his area of entry, despite frequent appearances of large numbers of law enforcement officers, for much longer: over one hour.

Accordingly, the nature and the circumstances of this offense establish the need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Bond

Bond resides in Gaithersburg, Maryland. He is 58 years old. He is self-employed, providing home improvement services in Maryland and the District of Columbia. As set forth in the Presentence Investigation Report, Bond has an extensive history of arrests, though none of the arrests occurred within the past ten years.

On October 12, 2010, Bond was charged with Assault Second Degree in Montgomery County, Maryland. On December 17, 2010, Bond was sentenced to probation before judgment. Moreover, on October 13, 2010, Bond was named as the defendant in a Montgomery County, Maryland, domestic violence case in which a protection order of some kind was issued. Bond was later charged in Montgomery County with violating a protection order on October 4, 2011, for which court records indicate he pled guilty and received a suspended 90-day sentence, with 75 days suspended, and a suspended $1000 fine.

On November 17, 1988, Bond pled guilty to driving under the influence in Prince George's County, Maryland, and he was sentenced to probation before judgment. While this

charge is quite old, Bond also has a string of convictions in Maryland for driving on a suspended license—in 2006, 2007, 2008, and 2009. Bond pled guilty in each instance. For the convictions on October 16, 2006, and April 1, 2008, Bond was sentenced to jail time.

Civil judgments against Bond have been issued in at least 16 cases. These matters include two federal tax liens filed by the United States. The two judgments arising from federal tax liens total over $84,000, and they date back to 2006 and 2010. The most recent civil judgment was issued in 2016.

All of these matters—while minor and older than 10 years (for criminal arrests)—are extensive and shed light on Bond's disregard for the law. This history also helps explain how Bond could readily ignore and tacitly encourage the chaos at the Capitol on January 6, 2021. Accordingly, Bond's history and characteristics also weigh in favor of a sentence of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41–42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Certain aspects of this case suggest a heightened need for specific deterrence.  For one, Bond's willingness to trespass into the Capitol grounds and push into the building through a broken window by the Senate Wing Door causes great concern.  Bond's willingness to remain in a violent mob for over an hour is likewise concerning.  Moreover, Bond's social media statements, including those that call for forcible rebellion and assassination, give further reason for a sentence that will deter any further misconduct.  Here, the United States submits that a brief period of incarceration and a term of probation will appropriately deter a defendant with an older criminal history, but who has also remained in compliance with all conditions of release and did not personally engage in violence at the Capitol.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Bond based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Bond has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to

---

[4] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity.  Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years.  For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense.  And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains precisely the same exact balance of aggravating and mitigating factors present here, the following cases offer points of comparison that may aid this Court's analysis. One way to compare Bond to other cases is to examine other cases where defendants did not directly engage in violence during the breach of the Capitol.

In *United States v. Little*, 21-cr-315 (RCL), the defendant entered the Capitol after witnessing law enforcement deploying tear gas and firing rubber bullets at rioters to prevent them

from breaching the building.  While in the Capitol building, the defendant celebrated with other rioters and communicated his actions over social media.  Prior to January 6, 2021, the defendant made posts on social media threatening civil war and gun violence against former President Trump's political opponents.  The defendant pled guilty to violating 18 U.S.C. § 5104(e)(2)(G), and the Court sentenced him to 60 days' incarceration.

In *United States v. Sorvisto*, 21-cr-320 (ABJ), the defendant entered the Capitol through the Senate Wing Doors and ignored multiple warning signs that it was unlawful to enter the Capitol building such as broken glass and the blare of the security alarm.  The defendant later instructed an associate to delete photos of the defendant from inside the Capitol.  The defendant pled guilty to violating 18 U.S.C. § 5104(e)(2)(G), and the Court sentenced him to 30 days' incarceration.

In *United States v. Buhler*, 21-cr-510 (CKK), the defendant ignored rioters scaling the scaffolding over the northwest staircase as she entered the Capitol through the Senate Wing Doors and entered and remained in the Senate Gallery, a sensitive area of the Capitol.  Buhler also cheered as rioters physically crushed U.S. Capitol Police officers at the East Rotunda door.  Buhler pled guilty to violating 18 U.S.C. § 5104(e)(2)(G), and the Court sentenced her to 30 days' incarceration and 36 months of probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have

sentenced that defendant."  *Id*. at 1095.

**V.     A sentence of probation may include imprisonment as a condition of probation.**

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.

Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other
> intervals of time, totaling no more than the lesser of one year or the term of
> imprisonment authorized for the offense, during the first year of the term of
> probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility"

to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983

WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement"

such as "for a week or two."  *Id.*[5]

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of

imprisonment as a condition of probation.  18 U.S.C. § 3653(b)(10).  Section 3563(b)(10)

authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of

imprisonment, which the defendant must serve during the first year of probation.  *Id.*  Thus, for a

violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to

---

[5] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not
intended to carry forward the split sentence provided in Section 3561, by which the judge imposes
a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404,
at *98.

require the defendant to serve up to six months in prison as a condition of probation. *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10). Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10). *See Anderson*, 787 F. Supp. at 539. Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each such interval is no more than 14 days. *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals) and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation); *United States v. Reed*, 21-cr-204 (BAH), ECF No. 177 (D.D.C. Apr. 14, 2022)

(same); *United States v. McCreary*, 21-cr-125 (BAH), ECF No. 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Howell*, 21-cr-217 (TFH), ECF No. 41 (D.D.C. Mar. 8, 2022) (imposing 60-day imprisonment sentence (six 10-day intervals) and three years of probation); *United States v. Schornak*, 21-cr-278 (BAH), ECF No. 71 (D.D.C. Feb. 18, 2022) (imposing 28-day imprisonment sentence (two 14-day intervals) and three years of probation).   Imposing an intermittent confinement sentence with 45 days/months of imprisonment as a condition of probation is appropriate in this case.

To be sure, earlier in the investigation of the January 6 attack on the Capitol, the government refrained from recommending intermittent confinement sentences given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.   At this point, however, multiple jury trials have successfully occurred, *see* Standing Order No. 22-64 (BAH), at 3 (D.D.C. Nov. 9, 2022) (noting that the Court has "forg[ed] ahead" and eas[ed] the backlog" of criminal cases since the Omicron surge began to abate in February 2022), and general COVID trends appear to show a decrease in cases.[6]

## VI.   A sentence imposed for a petty offense may include both imprisonment and probation.

The government's recommended sentence of 45 days in prison and 36 months of probation is also permissible under 18 U.S.C. § 3561(a)(3).   As Judge Lamberth observed, Section 3561(a)(3) "permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses." *United States v. Little*, 590 F.Supp.3d 340, 350 (D.D.C. 2022); *see generally* Appellee's Brief for

---

[6] *See* Centers for Disease Control and Prevention, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last viewed Dec. 22, 2022).

the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022).  Because the government has briefed a sentencing court's authority to impose a split sentence for a defendant convicted of a single petty offense in this Court and the D.C. Circuit, those arguments are not elaborated further here.[7]

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Bond to 45 days of incarceration, a 36-month term of probation, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759

---

[7] The defendant's appeal of the split sentence imposed in *Little* is pending.  The D.C. Circuit heard oral argument on November 2, 2022.

## <u>CERTIFICATE OF SERVICE</u>

On this 22nd day of December, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

*/s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759
